RECEIVED

NOV 0 2 2023

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| [UNDER SEAL], | Case No. _____ |
| Plaintiff, | COMPLAINT |
| v. | |
| [UNDER SEAL], | **FILED UNDER SEAL** |
| | **PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| Defendants. | |

**JURY TRIAL DEMANDED**

**DOCUMENT TO BE KEPT UNDER SEAL**

Nola J. Hitchcock Cross
**Cross Law Firm, S.C.**
[*Pro hac vice* to be submitted]
Lawyers Building
845 N. 11th Street
Milwaukee, WI 53233
Phone: 414-224-0000
Fax:    414-273-7055
Email: njhcross@crosslawfirm.com

Attorneys for [under seal]

RECEIVED

NOV 0 2 2023

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

**Filed Under Seal Pursuant
to 31 U.S.C. § 3730(b)(2)**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| UNITED STATES of AMERICA *ex rel.* EMILY HUNTER, <br><br> Plaintiff and Relator, <br><br> v. <br><br> SSM HEALTH CARE CORPORATION, <br><br> SSM-SLUH, INC., <br><br> SSM HEALTH CARE GROUP, INC. d/b/a SLU-CARE PHYSICIAN GROUP, <br><br> NICOLE MAYRIGHT, <br><br> and <br><br> JOHNNY TRUONG <br><br> Defendants. | Case No. _____ <br><br> COMPLAINT <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **JURY TRIAL DEMANDED** <br><br> *DOCUMENT TO BE KEPT UNDER SEAL* |

**FALSE CLAIMS ACT COMPLAINT**

Nola J. Hitchcock Cross
**Cross Law Firm, S.C.**
[*Pro hac vice* to be submitted]
Lawyers Building
845 N. 11th Street
Milwaukee, WI 53233
Phone: 414-224-0000
Fax:    414-273-7055
Email: njhcross@crosslawfirm.com

Attorneys for Relator Emily Hunter

**Filed Under Seal Pursuant
to 31 U.S.C. § 3730(b)(2)**

## Table of Contents

**I.    INTRODUCTION TO THE FALSE CLAIMS** ................................................................ 4

**II.   STATEMENT OF THE CASE** .......................................................................................... 8

**III.  FEDERAL JURISDICTION AND VENUE** ................................................................... 8

**IV.   PARTIES** .......................................................................................................................... 9

    **A.  Relator Hunter** ........................................................................................................ 9

    **B.  Government Plaintiff** ............................................................................................. 9

    **C.  Corporate Defendants** .......................................................................................... 9

    **D.  Individual Defendants** ......................................................................................... 10

**V.    APPLICABLE LEGAL AUTHORITY** ........................................................................ 11

    **A.  False Claims Act** ................................................................................................... 11

    **B.  Anti-Kickback Statute & Beneficiary Inducement Statute** ...................................... 13

    **C.  The Medicare Program's Payment of Claims for Prescription Drugs** .................. 17

        **1.    Medicare Part D Payment of Prescription Drugs Claims** .......................... **19**

        **2.    Copayments Under Medicare Part D** ......................................................... **23**

**VI.   FACTUAL BACKGROUND** ........................................................................................ 25

    **A.  Relator Hunter** ...................................................................................................... 25

    **B.  Defendants' Organizational and Operational Structure** ........................................ 26

**VII.  FALSIFICATION AND FRAUDULENT CONDUCT** .................................................. 28

    **A.  Relator's Discovery of the Copay Waiver Scheme** ................................................ 29

    **B.  Specific Examples of Copay Waivers & Tainted (False) Claims** ............................ 33

    **C.  Defendants' Low Risk Cover-up Scheme and Failure to Return Fraudulently
    Obtained Payments** ............................................................................................... 39

**VIII. COUNTS** ........................................................................................................................ 43

    COUNT ONE  False Claims Act, 31 U.S.C. § 3729(a)(1)(A)  (against all Defendants)
    Defendants' Copay Waiver Scheme ............................................................................ 43

    COUNT TWO  False Claims Act, 31 U.S.C. § 3729(a)(1)(G)  (against Defendants SSM
    Health, SSM-SLUH, and Maywright) Reverse False Claim / Failure to Return
    Overpayments) ............................................................................................................ 44

    COUNT THREE  False Claims Act, 31 U.S.C. § 3729(a)(1)(A)  (Against Defendants
    SSM Health, SSM-SLUH Inc. and SSM Slu-Care) Violation of the Stark Law .......... 45

**IX.   PRAYER FOR RELIEF** .............................................................................................. 47

**Filed Under Seal Pursuant**
**to 31 U.S.C. § 3730(b)(2)**

NOW COMES Relator Emily Hunter, through her attorney, Nola J. Hitchcock Cross of Cross Law Firm, S.C. and states that this is an action brought on behalf of the United States of America against **Defendant SSM Health Care Corporation** d/b/a **SSM Health**, its wholly owned pharmacy; **Defendant SSM-SLUH, Inc.**, through which it sells prescription medication; and its physician group, **Defendant SSM Health Care Group, Inc**. d/b/a SLU-Care Physician Group ("SLU-Care"), through which it prescribes the medications filled by SSM-SLUH, Inc; SSM Health's System Director of Community Pharmacy **Nicole Maywright**; and SSM-SLUH's former Pharmacy Manager **Johnny Truong** pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") for knowingly submitting or causing the submission of false claims for payment to the United States of America and for failing to repay fraudulently obtained Government funds. Relator also brings this action on behalf of herself to obtain a Relator share of the damages to the United States.

As and for her allegations against Defendants, Relator states as follows:

## I.    INTRODUCTION TO THE FALSE CLAIMS

1.    To fraudulently induce government Medicare Beneficiaries to purchase medication from its pharmacies, Defendants extended kickbacks in the form of copay waivers to those Beneficiaries, resulting in fraudulent medication payments to Defendants from Medicare in the millions of dollars.

2.    Specifically, Defendant SSM SLUH, Inc. waived, wrote off, and/or declined to collect required copayments for prescription drugs dispensed to Government Patient-Beneficiaries, thereby incentivizing such Beneficiaries to purchase prescription medications from

4

Defendants rather than going to any other pharmacy where they would be required to pay the Government-mandated copayments.

3.    Because Defendant SSM-SLUH's pharmacy is physically located within St. Louis University Hospital (SLUH) and thus in proximity to the high-volume kidney and liver transplant practice of Defendant SLU-Care Physician Group, many of the Patient-Beneficiaries who received unlawful copay waivers from Defendant SSM-SLUH, Inc. purchased expensive specialty medications, making the Patient-Beneficiaries' continued business very lucrative for Defendants SSM Health and SSM-SLUH, Inc., despite their foregoing receipt of the copayment and instead waiving it as a kickback to induce such purchases.

4.    Indeed, Defendant SSM-SLUH Inc.'s pharmacy filled more than 10,000 prescriptions each and every month, generating about $3,000,000 in *monthly* sales, at least an estimated 40% of which were dispensed to Beneficiaries of Government-funded healthcare programs, resulting in a total of about $14.4 Million annually in copay-waived prescription sales to Government Beneficiaries.

5.    As described below, Defendant SSM SLUH and its manager, Pharmacist-in-Charge Johnny Truong, sought to and did induce Patient-Beneficiaries of government healthcare programs to fill their prescriptions at Defendant SSM-SLUH Inc's pharmacy by routinely waiving and intentionally foregoing any good-faith efforts to collect copayments required to participate in Medicare, Medicaid, and similar government-funded healthcare programs, in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and Beneficiary Inducement Statute, 42 U.S.C. § 1320a-7a(a)(5) (hereinafter, the **Copay Waiver Scheme**).

5

**Filed Under Seal Pursuant
to 31 U.S.C. § 3730(b)(2)**

6.      By late February 2023, Defendant SSM Health and its senior management, including Assistant General Counsel Christopher Scofield and Nicole Maywright, were fully aware of the nature and extent of the **Copay Waiver Scheme.**

7.      Yet, by March 15, 2023, Defendant SSM Health, acting through Defendant Maywright, Scofield and other senior management, strategically determined that the risk of the **Copay Waiver Scheme** being discovered by government auditors was too low to warrant complying with the False Claims Act's mandatory requirement to self-disclose the violations to the Government and repay the fraudulently obtain funds.

8.      Instead, Defendants made the strategic decision to retain the fraudulently obtained government funds and to cover up their fraud to that it would not be detected even if they were subject to a government audit.

9.      Defendant SSM Health specifically and tactically decided against sending statements to any of the affected Patient-Beneficiaries or otherwise engaging in any good-faith collection efforts, while directing that the Patient-Beneficiaries' account balances be systematically "written off," not all at once, but in stages based upon the strategy that such course of conduct would avoid government detection in the event of an audit. (hereinafter referred to as the **Low Risk Cover-Up Scheme).**

10.     As described in detail below, Defendants were aware that compliance with the Anti-kickback Statute and Beneficiary Inducement Statute were material conditions of Medicare payment, and therefore were aware that the Copay Waiver Scheme had caused the submission and payment of false claims.

11.     Indeed, Defendants' knowledge of the legal requirements were demonstrated by their own scheme to cover up the fraudulent billing.

6

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

12. Nonetheless, Defendants elected to retain the fruits of their fraudulently obtained funds from the Taxpayers rather than returning the corresponding payments to the Government, in brazen and strategic violation of 31 U.S.C. § 3729(a)(1)(G).

13. Underscoring the brazenness of Defendants' scheme, in or about April and May 2023, as the **Low Risk Cover Up Scheme** was in full-swing, Defendant Maywright expressly stated that the goal of the Scheme was to prevent Patient-Beneficiaries from "transferring" to a different pharmacy or contacting the insurance companies administering their benefits with questions.

14. This action seeks to recover those sums, together with the statutory multipliers and penalties, from the Defendants for the Taxpayers, as more fully set forth below.

15. Defendant SSM Health is a centrally managed, fully integrated health care delivery system with its headquarters based in St. Louis, Missouri and operations in Missouri, Wisconsin, Oklahoma, and Illinois.

16. In addition to ownership and operation of 23 hospitals, 13 post-acute care facilities, a pharmacy benefit management company (PBM), and an extensive network of physician practice operations, Defendant SSM Health provides retail and specialty pharmacy services at twenty-six (26) pharmacies operated through eleven wholly owned subsidiaries, including Defendant SSM SLUH, Inc., a pharmacy physically located within St. Louis University Hospital, a 356-bed academic medical center owned by Defendant SSM Health.

17. In February 2023, Relator Emily Hunter, then a Business Manager for SSM Health's Pharmacy division, discovered that Defendant SSM SLUH, Inc. had systematically waived over $740,000 of copayment obligations beginning at least by mid-2021.

7

**Filed Under Seal Pursuant
to 31 U.S.C. § 3730(b)(2)**

## II.    STATEMENT OF THE CASE

18.    Relator Emily Hunter brings this action on behalf of the United States of America for treble damages and civil penalties arising from Defendants' fraudulent conduct in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") with respect to Defendants' schemes to submit, or cause the submission of, false claims to and paid for by the Government's healthcare programs, including but not limited to Medicare, Medicaid and TRICARE, for prescription drugs provided to patients whose copayments were waived by Defendant SSM SLUH, Inc. in violation of 42 U.S.C. § 1320a-7a.

19.    This is a *qui tam* action against Defendants to recover damages and civil penalties on behalf of the United States of America arising from false claims resulting from copay waiver kickbacks and decision not to self-report or to repay Government payments fraudulently obtained in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA").

## III.    FEDERAL JURISDICTION AND VENUE

20. This court has jurisdiction over this case pursuant to 31 U.S.C. § 3732(a) as well as under 28 U.S.C. § 1345 because acts prohibited by 31 U.S.C. §§ 3729 *et seq.* and set forth with particularity herein occurred in and around the St. Louis, Missouri metropolitan area, with many of the Patient-Beneficiaries and therapy providers involved located in the Eastern District of Missouri.

21.    Venue is proper in the Eastern District of Missouri pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), because the Defendants transact business in this District and one or more of the acts committed by the Defendants and covered by 31 U.S.C. § 3729 occurred in this District.

8

22.     Relator previously provided notice and information regarding this matter to the office of the United States Attorney for the Eastern District of Missouri.

## IV.    PARTIES

### A.  Relator Hunter

23.     **Emily Hunter** is a citizen of the United States of America and a resident of the State of Wisconsin.

24.     Relator Hunter worked for Defendant SSM Health from January 2018 to June 2023 as a System Business Manager for Community and LTC Pharmacy.

25.     Relator Hunter brings this action on behalf of the United States of America pursuant to 31 U.S.C. § 3730(b)(2) and on behalf of herself, for a Relator Share pursuant to 31 U.S.C. § 3730(d), based upon her independent and direct personal knowledge.

### B.  Government Plaintiff

26.     The **United States of America** is a sovereign country whose Department of Health and Human Services ("HHS") pays claims submitted or caused to be submitted to it by Defendants through the Medicare program, the Medicaid program, the TRICARE program, the CHAMPUS program, and the Federal Employees' Compensation Act.

27.     Relator brings this *qui tam* action on behalf of the United States of America pursuant to 31 U.S.C. § 3730(b)(1).

### C.  Corporate Defendants

28.     **Defendant SSM Health Care Corporation dba SSM Health** is a non-profit corporation incorporated under the laws of Missouri with its principal place of business located at 10101 Woodfield Lane, Saint Louis, Missouri 63132.

9

**Filed Under Seal Pursuant
to 31 U.S.C. § 3730(b)(2)**

29.    SSM Health Care Corporation's registered agent, CT Corporation, is located at 20 South Central Avenue, Suite 400, St. Louis, Missouri 63105.

30.    **Defendant SSM Health Care St. Louis, Inc**. is a non-profit corporation incorporated under the laws of Missouri, with its principal place of business located at 10101 Woodfield Lane, Saint Louis, Missouri 63132.

31.    SSM Health Care St. Louis, Inc.'s registered agent, CT Corporation, is located at 20 South Central Avenue, Suite 400, St. Louis, Missouri 63105

32.    **Defendant SSM-SLUH, Inc.**, is a non-profit corporation incorporated under the laws of Missouri, with its principal place of business located at 10101 Woodfield Lane, Saint Louis, Missouri 63132.

33.    SSM-SLUH, Inc.'s registered agent, CT Corporation, is located at 20 South Central Avenue, Suite 400, St. Louis, Missouri 63105.

34.    **Defendant SSM Health Care Group, Inc. dba SLU-Care Physician Group** is a non-profit corporation incorporated under the laws of Missouri, with its principal place of business located at 10101 Woodfield Lane, Saint Louis, Missouri 63132

35.    On information and belief, Defendant SLU-Care Physician Group's sole member and owner is SSM Health Care St. Louis, Inc., a subsidiary and holding company through which Defendant SSM exercises ownership and control of Defendant SLU-Care.

36.    Defendant SLU-Care's registered agent, CT Corporation, is located at 120 South Central Avenue, Suite 400, St. Louis, Missouri 63105.

## D. Individual Defendants

37.    **Defendant Nicole Maywright** is an adult resident of the United States of America, State of Missouri.

10

38.     At all times relevant to this complaint. Maywright was Defendant SSM Health's System Director of Community Pharmacy responsible for directing and supervising Defendant Truong during the Copay Waiver Scheme and overseeing implementation of the subsequent Low Risk Cover Up Scheme in conjunction with Assistant General Counsel Christopher Scofield.

39.     **Defendant Johnny Truong** is an adult resident of the United States of America and the State of Missouri, where he has been a licensed pharmacist since July 2016.

40.     Defendant Truong was employed as Pharmacy Manager of Defendant SSM Health's pharmacy, Defendant SSM-SLUH, Inc., from about 2020 until February 2023 during which time he was directly responsible for the day-to-day implementation of the Copay Waiver Scheme.

## V.    APPLICABLE LEGAL AUTHORITY

### A. False Claims Act

41.     Congress substantially amended the federal False Claims Act ("FCA"), originally enacted during the Civil War, in 1986, 2009, and 2010, to enhance the ability of the United States to recover losses it sustained as a result of its payment of false claims and to recover damages and penalties for such false claims.

42.     Through the 1986 Congressional hearings, Congress found that false claims for payment in federal programs was pervasive and that the FCA is a primary tool for combating false claims to the government, whereupon Congress amended the Act with the intention of enhancing incentives for individuals who have knowledge of false claims against the Government to disclose the information without fear of reprisals. *See generally, False Claims Act Amendments: Hearings before the Subcomm. of Admin. Law and Gov't Relations of the Comm. on the Judiciary*, 99th Cong. 48 (1986).

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

43. The current FCA is designed to encourage "Relators" to come forward with information based on personal knowledge and for the private bar to commit legal resources to pursuing fraud on the Government's behalf and to create a private/public partnership to obtain recovery for false claims submitted to the Government. *See generally, False Claims Act Amendments: Hearings before the Subcomm. of Admin. Law and Gov't Relations of the Comm. on the Judiciary*, 99th Cong. 48 (1986).

44. The FCA subjects a person to liability under section 31 U.S.C. §§ 3729 *et seq.* who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

45. Under 31 U.S.C. § 3729 (b)(1), the "terms 'knowing' and 'knowingly:'"

> (A) means that a person, with respect to information—
>
> > (i) has actual knowledge of the information;
> >
> > (ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and;

(B) require no proof of specific intent to defraud.

46.     After a catch-up inflation increase, the range of the civil penalties has been adjusted for inflation by an annual cost-of-living-adjustment. Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (Section 701 of the Bipartisan Budget Act of 2015, Public Law 114–74).

47.     For civil penalties assessed after January 30, 2023 whose associated violations occurred after November 2, 2015, the civil monetary penalties are between $13,508 and $27,015 per violation. 28 C.F.R. § 85.5.

## B. Anti-Kickback Statute & Beneficiary Inducement Statute

48.     The Medicare and Medicaid Fraud and Abuse Statute (the "Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977. The Anti-Kickback Statute arose out of Congressional concern that providing something of value to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population.

49.     To protect the integrity of Government healthcare programs from the difficult to detect harms stemming from kickbacks, Congress enacted a prohibition against the payment of kickbacks in any form, *regardless* of whether the particular kickback actually gives rise to provable overutilization or poor quality of care. 42 C.F.R. §§ 422.504(h), 423.505(h).

50.     The Anti-Kickback Statute ("AKS") prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging

13

for the purchase of any item or service for which payment may be made under a federally funded healthcare program. 42 U.S.C. § 1320a-7b(b).

51.     The AKS ascribes liability to *all* parties in an impermissible kickback relationship.

52.     Claims for payment for services that result from kickbacks are false *per se* under the False Claims Act. 42 U.S.C. § 1320a-7b(g).

53.     Compliance with the Anti-Kickback Statute is a *condition of payment* for claims administered by physicians for which payment is sought under Government healthcare plans.

54.     Medicare Regulations and the CMS -1500 and 1450 forms (formerly HCFA) expressly provide that certification of compliance with the Anti-Kickback Statute is a precondition to governmental payment, *e.g.*, 42 C.F.R. §§ 422.504(h), 423.505(h).

55.     All Government healthcare plans require every provider who seeks payment to promise and ensure compliance with the provisions of the Anti-Kickback Statute and with other federal laws governing the provision of healthcare services in the United States.

56.     As such, if a provider informs CMS or its agent that it provided services in violation of the Anti-Kickback Statute or another relevant law including off label indications, CMS will not pay any related claims because such compliance is material to the payment of the claim by CMS.

57.     The Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Anti-Kickback Statute or "Social Security Act," 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "Anti-Kickback" provisions to be enforced under the FCA, with its enhanced damages.

58.    The PPACA also amended the Social Security Act's "intent requirement" to clarify that violations of the Social Security Act's Anti-Kickback provisions may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." 42 U.S.C. § 1320a-7b(h)

59.    Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation.  42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7)

60.    Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under the Medicare and Medicaid programs as required by the Provider Agreements set forth in Forms CMS-855A and CMS-855I.

61.    Either pursuant to Provider Agreements, claim forms, or other appropriate manner, hospitals and physicians who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute. 42 C.F.R. § 424.510(d)(3).

62.    Any party convicted under the Anti-Kickback Statute *must be* excluded from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(1)

63.    Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary *may* exclude that provider from the federal health care programs for a discretionary period and, if so, the Secretary must also direct that the provider be likewise excluded from the State health program which shared federal funds, such as Medicaid, and may impose administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b)

15

64.    The Anti-Kickback Statute and the corresponding regulations establish ''safe harbors'' for specified common business arrangements. The safe harbors protect arrangements from creating liability under the statute. An arrangement must fit squarely in a "safe harbor" to be protected. Safe harbor protection requires strict compliance with all applicable conditions set out in the relevant regulation.

65.    The "discount" safe harbor is discussed at 42 C.F.R. § 1001.952(h)(5) as follows: "[T]he term discount means a reduction in the amount a buyer (who buys either directly or through a wholesaler or a group purchasing organization) is charged for an item or service based on an arms-length transaction. The term discount does not include –

> (ii) Supplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service, unless the goods and services are reimbursed by the same Federal health care program using the same methodology and the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology;
>
> (iii) A reduction in price applicable to one payer but not to Medicare, Medicaid or other Federal health care programs.

66.    The federal Beneficiary Inducement Statute 42 U.S.C. § 1320a–7a(a)(5), in conjunction with the federal Antikickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B), renders "any person" who "offers to or transfers remuneration to any [Medicare of Medicaid beneficiary] that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which [Medicare or Medicaid] payment may be made, in whole or in part…" liable under the False Claims Act

16

(FCA), as claims resulting from such inducements are per se false under the FCA. 42 U.S.C. § 1320a–7b(g).

67.     As described below, pharmacies like Defendant SSM-SLUH Inc. contract with Medicare Part D sponsors and agree to comply with the AKS and Beneficiary Inducement Statute as a precondition to participation.

68.     A copayment waiver by a pharmacy is a form of remuneration under the Anti-Kickback Statute and can give rise to liability under the AKS, 42 U.S.C. § 1320a-7b(b)(3)(G), which in turn "constitutes a false or fraudulent claim for purposes" of the False Claims Act. 42 U.S.C. § 1320a-7b(g), unless:

(i)     the waiver is not offered as part of any advertisement or solicitation;

(ii)    the person does not routinely waive coinsurance or deductible amounts; **and**

(iii)   the person—

(I)     waives the coinsurance and deductible amounts after determining in good faith that the individual is in financial need; or

(II)    fails to collect coinsurance or deductible amounts after making reasonable collection efforts;

42 U.S.C. § 1320a-7a(i)(6) (emphasis added).

### C. The Medicare Program's Payment of Claims for Prescription Drugs

69.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, enacted in 1965, established the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program. Pursuant to the Medicare program and other government healthcare programs described below, the government pays claims for certain medical services, including

17

prescription drugs, for persons aged 65 and older, and for persons with disabilities. 42 U.S.C. § 1395k(a)(2)(C)

70.    Medicare pays healthcare providers for the reasonable costs of providing medically necessary covered health services to Medicare beneficiaries.  42 U.S.C. § 1395x(v)(1)(A).

71.    Critical to the continued solvency and viability of Medicare and other Government health programs is that healthcare providers bill only for services that are performed, that are "reasonable," and that are medically necessary. 42 U.S.C. § 1395x(v)(1)(A)

72.    The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program.

73.    The Center for Medicare and Medicaid Services ("CMS") is the division of HHS directly responsible for the administration of Medicare.

74.    Medicare Part A provides hospital insurance benefits to the elderly and disabled. 42 U.S.C. §§ 1395c *et seq.*

75.    Medicare Part B is a federally subsidized, voluntary insurance program that pays a portion of the cost of certain medical and other health services not covered by the Part A program, including pain treatment and physical therapy services.

76.    Medicare Part C, the Medicare Advantage program, covers both Part B and C and can cover additional services through plans administered by private insurance companies.

77.    Medicare Part D, the Medicare Prescription Drug Benefit, at issue herein, covers the costs of prescription drugs and is also available as part of Part C Medicare Advantage plans.

78.    The Federal Government administers other healthcare programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, Medicaid, and federal workers'

18

compensation programs, all of which have received, relied on the accuracy of, and paid for false claims for prescription drugs submitted or caused to be submitted by Defendants.

79.    The Medicaid Program, administered by individual states and jointly funded by State and Federal taxpayer revenue, is a health insurance program also created as part of the Social Security Act, 42 U.S.C. §§ 1396-1396v.

80.    Like the federal False Claims Act, the **Missouri Health Care Payment Fraud and Abuse Act**, Mo. Rev. Stat. §§ 191.900, *et seq.*, prohibits health care providers, including pharmacies, from making or causing materially false claims to be submitted to the Missouri Medicaid program.

81.    TRICARE/CHAMPUS, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. 10 U.S.C. §§ 1071 *et seq.*; 32 C.F.R. § 199.4(a).

82.    CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.  38 U.S.C. §§ 1781 *et seq.*; 38 C.F.R. § 17.270(a).

## 1.  Medicare Part D Payment of Prescription Drugs Claims

83.    The Medicare prescription drug benefits program, known as Medicare Part D, became effective January 1, 2006 as part of the Medicare Prescription Drug Improvement and Modernization Act of 2003. 42 U.S.C. § 1395w-101(a)(2).

84.    The United States annually pays approximately 75 to 80 percent of the cost of providing covered drugs to Medicare Part D Beneficiaries.

85.    The United States does not pay pharmacies directly.

**Filed Under Seal Pursuant
to 31 U.S.C. § 3730(b)(2)**

86. Rather, the United States, through the Center for Medicare & Medicaid (CMS), pays Medicare Part D Plan Sponsors, typically private insurance companies, advance monthly payments, comprised of a direct subsidy per-Beneficiary based on the part D Sponsor's accepted standardized, estimated subsidies for catastrophic coverage, and estimated low-income subsidies. 42 C.FR. §§ 423.315, 423.320

87. The Part D Sponsors then use the funds from CMS to administer Part D plans and to pay claims received from retail pharmacies, referred to as "downstream entities" under 42 C.F.R. § 423.4 or "network pharmacies", either directly or through additional intermediaries known as Pharmacy Benefit Managers ("PBMs").

88. Thus, when a pharmacy such as Defendant SSM-SLUH, Inc. dispenses a drug to a Medicare Beneficiary, it typically submits an electronic claim to a Pharmacy Benefit Manager, which causes the PBM to submit the electronic claim to the Beneficiary's Part D plan which pays the remaining amount determined under the plan/contract after the Beneficiary pays his or her portion of the price of the prescription drug in the form of a partial payment, commonly referred to as a "co-pay" or "coinsurance."

89. In the pharmacy industry, the PBM third-party administrators typically act as intermediaries between retail pharmacies and insurers, facilitating the processing and payment of prescription drug claims, including the payment of reimbursement monies to pharmacies and the submission of cost data to the Government on behalf of the Part D Plan Sponsor.

90. In order to become and remain contract providers for a Part D Plan Sponsor, **Defendants SSM Health, SSM Health Care St. Louis, and SSM-SLUH, Inc.** are required to comply with all applicable "federal laws, regulations, and CMS instructions." 42 C.F.R. § 423.505(i)(4)(vi)

20

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

91.      Defendants SSM Health, SSM Health Care St. Louis, and SSM-SLUH, Inc. also agreed with the Government as a condition of payment "to comply with Federal laws and regulations designed to prevent fraud, waste and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act," 32 U.S.C. §§ 2729 *et seq.* 42 C.F.R. § 423.505 (h)(1)

92.      Defendants SSM Health, SSM Health Care St. Louis, and SSM-SLUH, Inc., as contract providers for Part D Plan Sponsors, are also required to comply with all applicable pharmacy and prescription drug *state* standards as part of its contractual agreement. 42 C.F.R. § 423.504(b)(iv)(A)

93.      Defendants SSM Health, SSM Health Care St. Louis, SSM-SLUH, Inc., as contract providers for Part D Plan Sponsors, must and do certify that the claims data they submit or cause to be submitted submits are "accurate, complete, and truthful," and that the claims data will be used to obtain Government payments. 42 C.F.R. § 423.505 (k)(3).

94.      Specifically, when Defendant SSM-SLUH, Inc. dispenses a drug to a Medicare Part D enrollee, it submits a claim to Part D Sponsors, often via a PBM, containing several pieces of material information, including the cost of the dispensed drug and the amount of any copayment paid by the Beneficiary.

95.      Thus, accurate details regarding the required co-payment are a material element for coverage and payment.

96.      The Part D Sponsor then uses that information provided or caused to be provided by Defendants SSM-SLUH, Inc. and SSM Health; reformats it; and submits it to CMS as a "Prescription Drug Event" ("PDE") record, attesting to its accuracy.

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

97.   The PDE's required data set contains about 38 individual "fields" including: the drug dispensed, the prescription number, the dispensing fee paid to the pharmacy, the cost of the drug, quantity dispensed, and the provider who ordered the medication, including the provider's unique identifying number assigned by the licensing State, as well as the amount of copay paid by the Beneficiary.

98.   **PDE Field 33** is the "Patient Pay Amount," which includes Beneficiary copayments and coinsurance. CMS, *Prescription Drug Event Record Layout*, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwi0hcO 458_qAhUZa80KHYj2BUYQFjAAegQIBhAB&url=https%3A%2F%2Fwww.cms.gov%2FMed icare%2FPrescription-Drug- Coverage%2FDrugCoverageClaimsData%2FDownloads%2FFileFormat_020806.pdf&usg=AOv Vaw3qyQxAuTcaSk2FHd7xrevn [accessed July 15, 2020].

99.   CMS then uses the PDE data, including the copay data, at the end of the payment year when it *reconciles its advance payments* to the Part D Sponsor with the costs the Sponsor has incurred throughout the year, pursuant to § 1860D-15(f)(1) of the Social Security Act.

100.   Thus, the PDE records themselves constitute a "claim" for purposes of the False Claims Act and its Missouri counterpart, and compliance with the requirement that such PDE data is "true, accurate, and complete" as a *condition of payment* under the Medicare Part D program. 42 U.S.C. § 1395w115(c)(1)(C), (d)(2); 42 C.F.R. § 423.322.

101.   PDEs submitted to Government health plans, including Medicare, with inaccurate Patient Pay amounts do not contain "**accurate, complete, and truthful information**" about all data related to payment and are thus false claims for payment, as Part D Sponsors are required to certify under 42 C.F.R. § 423.505(k).

22

102. Accordingly, Part D Sponsors require that contract pharmacies, like SSM-SLUH, Inc, submit claims with accurate, complete, and truthful Patient Pay amounts.

103. At all times relevant to this Complaint, Defendants were aware of the above-described statutory and regulatory requirements and rules governing claims submitted to Medicare Part D Sponsors, as they provide trainings, conduct audits, and publish policies purportedly designed to ensure compliance with Medicare's conditions of payment.

### 2. Copayments Under Medicare Part D

104. A Part D Medicare Beneficiary may be required to make a partial payment for the cost of these prescription drugs in the form of a "copayment," "coinsurance," or "deductible" (collectively "copays").

105. The patient copay obligations in Medicare Part D exist to encourage efficient use of federally reimbursed health care products by health care providers and consumers and to deter waste.

106. Generally, Medicare Part D benefits require copays that vary throughout the year depending upon a Beneficiary's total Part D covered expenses incurred that year up to that point. See 42 U.S.C. § 1395w-102

107. In the **first coverage phase**, known as the deductible phase, Beneficiaries are responsible for 100 percent of drug costs until meeting an annual deductible amount Id. § 1395w-102(b)(1)

108. In the **second coverage phase**, Beneficiaries pay a 25 percent copay until reaching an "initial coverage limit." Id. § 1395w-102(b)(2)

109.    In the **third coverage phase**, known as the "coverage gap" or "donut hole," Beneficiary copay obligations are higher until the patient reaches an "annual out-of-pocket threshold. See 42 U.S.C. § 1395w-102(b)(2)(D)

110.    In the **fourth and final phase of coverage,** known as "catastrophic coverage," Beneficiaries who do not qualify for low-income-subsidies pay a copay equaling the greater of 5 percent of the prescription drug cost or a small, fixed dollar amount. 42 U.S.C. § 1395w-102(b)(4) The federal government reimburses 80 percent of all prescription drug costs in this "catastrophic coverage" period through a "reinsurance subsidy" provided to the Part D plans; the Part D plans reimburse the remaining 15 percent.

111.    In order to receive Part D funds from CMS, the Part D Plan Sponsors, as well as their authorized agents, employees, and contractors, including pharmacies, are required to comply with applicable federal laws, regulations, and CMS instructions.

112.    By statute, all contracts between a Part D Plan Sponsor and HHS must include a provision whereby the Plan Sponsor agrees to comply with the applicable requirements and standards of the Part D program as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112

113.    Further, CMS regulations expressly require Part D Plan Sponsors to certify, in their contracts with CMS, that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the FCA and AKS. See 42 C.F.R. § 423.505(h)(1).

114.    Indeed, Medicare Part D Sponsors' contracts, including those to which Defendants SSM Health, SSM Health Care St. Louis and SSM-SLUH, Inc. were parties at all times relevant to this complaint, expressly prohibit waivers, rebates, or discounts extended to

24

Plan Members` copayment obligations except where expressly allowed under federal and/or state law and CMS regulations.

## VI.    FACTUAL BACKGROUND

### A. Relator Hunter

115.    Relator Emily Hunter graduated from Lakeland College in 2014 with a Bachelor`s degree in Business Administration and Management and she has worked in the pharmacy industry ever since.

116.    From December 2012 until January 2016, shortly before she obtained her Master of Business Administration (M.B.A.) degree from the University of Wisconsin-Whitewater, Relator worked as a Pharmacy Technician for a regional pharmacy group, Hometown Pharmacy.

117.    In January 2016, Agnesian Health Care hired Relator as a Supervisor of Pharmacy Business Operations and Hunter remained in that role following Agnesian's merger with Defendant SSM Health in 2018, whereupon Relator became an employee of Defendant SSM Health.

118.    In November 2019, Defendant SSM Health promoted Relator to Business Manager of Pharmacy Operation.

119.    As Business Manager, Relator oversaw financial reporting, revenue cycle, credentialing, licensing, software and vendor transitions, formulary development and wholesale relations; workflow and cost-reduction projects; interdepartmental operations; and contract administration, negotiation, and pricing, all for about twenty-six (26) retail pharmacies in Wisconsin, Illinois, Oklahoma, and Missouri, including Defendant SSM-SLUH, Inc.

120.    At all times material, Relator worked for SSM Health from Wisconsin.

**Filed Under Seal Pursuant
to 31 U.S.C. § 3730(b)(2)**

121.    In June 2023, Relator left Defendant SSM Health and commenced employment as a Pharmacy Benefit Manager (PBM) Specialist for Clearway Health.

## B. Defendants' Organizational and Operational Structure

122.    The organization that would become Defendant SSM Health began in 1872, when five (5) German nuns known as the Sisters of St. Mary (SSM) began providing healthcare to their congregants before opening their first hospital in 1877.

123.    In 1988, Defendant SSM Health was incorporated to centrally own and manage what had previously been a group of centrally owned, but independently managed, hospitals sponsored by the congregations that would become the Franciscan Sisters of Mary.

124.    Since then, Defendant SSM Health has expanded to become a fully integrated health system, with 22 hospitals and 26 pharmacies owned and operated by Defendant SSM Health, directly or as subsidiaries, with Defendant SSM centrally managing most core functions, including human resources, finance, strategy and planning, marketing and communications, and regulatory compliance.

125.    Incorporated in 2015 following Defendant SSM Health's purchase of St. Louis University Hospital's operations from Tenet Health, Defendant SSM-SLUH, Inc. operates as a "full-service, walk-in retail pharmacy, conveniently located on the first floor lobby of SSM Health Saint Louis University Hospital, adjacent to the Fleur De Lis Gift Shop," as described on Defendant SSM Health's website at https://www.ssmhealth.com/locations/location-details/pharmacy-saint-louis-university-hospital, and a short walk from several SSM medical providers, clinicians and specialty groups, i.e. its primary referral sources.

26

**Filed Under Seal Pursuant
to 31 U.S.C. § 3730(b)(2)**

126.    Since 2015, Defendant SSM Health has owned and operated St. Louis University Hospital through SSM Health's wholly owned and controlled subsidiary, Defendant SSM Health Care St. Louis, Inc.

127.    Defendants SSM Health centrally manages Defendant SSM-SLUH, Inc. and Defendant SSM Health Care St. Louis, Inc, both of which have the same SSM Health executives as their respective President, Vice President, Secretary, and Treasurer and the same headquarters as Defendant SSM Health.

128.    The majority of Defendant SSM-SLUH Inc.'s pharmacy customers are referred to Defendant SSM-SLUH Inc. by physicians based in Defendant SSM Health Care St. Louis, Inc.'s St. Louis University Hospital and employed by Defendant SSM Health Care Group, Inc. d/b/a SLU-Care Physician Group, another subsidiary through which Defendant SSM provides medical services.

129.    Laura Kaiser has been Defendant SSM Health's President and Chief Executive Officer (CEO) since May 2017.

130.    Reporting directly to CEO Kaiser are various senior executive officers, including Chief Clinical Officer Todd Schuman.

131.    Schuman's direct reports include Vice President of Pharmacy Services Kim Spencer and System Director of Regulatory Compliance Denise Wilson.

132.    Relator's supervisor, Director of Business Operations Michelle Schmitt, reports directly to Vice President of Pharmacy Services Kim Spencer.

133.    As System Director of Community Pharmacy, Defendant Nicole Maywright reports to Vice President of Pharmacy Population Health Kristin Cannon, who reports to Kim Spencer.

27

134. While Director Schmitt and Relator's team are generally focused on the business aspects of Defendants' pharmacy operations. e.g., finance and pricing. Director Maywright and her team are generally focused on pharmacy operations.

135. Each individual pharmacy under Defendant SSM Health's ownership and management has its day-to-day operations supervised by an on-site Pharmacy Manager, who serves as the legally required Pharmacist-in-Charge ("PIC"); oversees a team of staff pharmacists and technicians; and reports directly to Defendant Maywright and Regional Pharmacy Managers who report to Director Maywright.

136. Defendant SSM-SLUH Inc.'s Pharmacy Manager and PIC from 2020 until February 2023 was pharmacist Johnny Truong, who reported directly to Defendant Maywright.

137. At all times relevant to this complaint. Defendant SSM-SLUH, Inc. used **NRx®
QS/1**, a pharmacy management software platform, to generate and retain prescription records. including point-of-sale records and patient account records; and used **eRx Network** to process claims for payment submitted to insurance plans and their PBM intermediaries.

## VII.   FALSIFICATION AND FRAUDULENT CONDUCT

138. As introduced above, **Defendant SSM Health**, through its wholly owned and controlled subsidiary **Defendant SSM-SLUH, Inc.**, and Defendants Maywright and Truong engaged in a fraudulent scheme to submit or cause the submission of false claims to Government funded health insurance plans for medication dispensed to Beneficiaries of Medicare and other government healthcare programs in violation of the Anti-Kickback Statute and the Beneficiary Inducement Statute.

28

139. Such claims are *both* factually and legally false because violations of the AKS and Beneficiary Inducement Statute cause (a) materially inaccurate claims data and (b) expressly false certifications of compliance to be submitted to the Government via PDE forms.

140. In addition, Defendants SSM Health and SSM-SLUH, Inc., acting through Defendant Maywright and other senior executives, engaged in a separate scheme to conceal the false claims caused by the Copay Waiver Scheme.

## A. Relator's Discovery of the Copay Waiver Scheme

141. As Defendant SSM Health's Pharmacy Manager for Defendant SSM-SLUH and As its Pharmacist in Charge ("PIC"), Defendant Johnny Truong was responsible for creating and updating the pricing table.

142. In January 2023, an employee at Defendant SSM-SLUH sought clarification from Defendant SSM Health's Community Pharmacy Operations team regarding certain drug prices listed in SSM-SLUH's "pricing table," which is a comprehensive list of the prices the pharmacy charges patients and insurers for specified medications.

143. In the course of responding to the SSM-SLUH employee's questions, Defendant Nicole Maywright and her team reviewed SSM-SLUH's pricing table and determined that Defendant Johnny Truong had been manipulating and revising the pricing table to provide discounts to patients for more than 8,000 dispensed prescriptions going back to 2021.

144. When Defendant Maywright confronted Defendant Truong about the pricing table discrepancies on or about February 13 or 14, 2023, Defendant Truong resigned immediately.

145. Because Defendant Truong's manipulation of the pricing table impacted SSM-SLUH's financial records and required a review of its Accounts Receivable ("AR") records in addition to corresponding pricing and individual transaction records, Relator, as SSM-SLUH's

29

Business Manager, and her team of analysts, were directed to assist Defendant Maywright in a review of SSM-SLUH's billing and pricing practices.

146.    During this review, Relator and her team discovered that over the course of about two years, Defendant SSM-SLUH had **waived over $740,000** worth of copayments, thus inducing Government Beneficiaries to become returning customers, often with high dollar prescriptions.

147.    On February 16, 2023, Relator emailed her team's findings regarding the uncollected balances, which had already been reported to Defendant Maywright, to her supervisor, Michelle Schmitt, SSM Health's Director of Business Operations-Pharmacy, who replied the next day:

> **Ouch, this is huge! How did accounting or no one else discover that huge gap earlier? I mean I understand it's in A/R so it looks like it should be coming to us, but you'd think that accounting would have notice [sic] the A/Rr account going up month over month and have raised a red flag!**

148.    Further review of records of individual dispensed prescriptions and transactions by Relator's team the following week of February 20, 2023 confirmed Defendant SSM-SLUH, at Defendant Truong's direction, has been routinely waiving copayments beginning no later than 2021.

149.    For example, in addition to the over $740,000 of uncollected copays reflected in Accounts Receivable ("AR") records, the "patient notes" documented in SSM-SLUH's electronic pharmacy management software, NRx, indicated that SSM-SLUH was often providing discounts at the point-of-sale and contained multiple references to "free drugs," "covering copays" and "cost sharing," i.e. a thinly veiled reference to reduced and/or waived copays.

30

150.   Indeed, in one patient note entered February 14, 2022, a Defendant SSM-SLUH, Inc. employee directly referenced the purposes of the copay waivers, i.e. to induce continued business, stating:

> **No longer covering copays for this patient. If she wants prescriptions transferred, offer to transfer to another pharmacy. Have not talked to patient regarding matter**.

151.   Defendant notes in patient accounts also indicate that Defendant SSM Health, through Defendant Maywright and her team, were aware of Defendants SSM-SLUH, Inc. and Truong's Copay Waiver scheme.

152.    For example, a note entered by an SSM-SLUH-Inc. employee mentions a February 17, 2023 instance in which one of Defendant Maywright's direct reports, Brent McClain, was asked for by an SSM-SLUH employee and gave *permission* "**to charge copay to SLUH A/R at register**," underscoring the waiver presumption nature of SSM-SLUH, Inc.'s longstanding, routine Copay Waiver Scheme.

153.   Relator's investigation revealed that SSM-SLUH had failed to engage in any good-faith effort to collect the outstanding copayments. Instead, Defendants had permanently waived the co-payments.

154.   Confirming the intentional nature of the co-payment waivers, Relator's investigation also revealed that SSM-SLUH had failed to conduct or document any good-faith determination that a government Beneficiary's financial need justified a decision to waive or discount Beneficiaries' copayment obligations. Instead, waiver decisions were based solely on whether repeat lucrative prescriptions could be induced by co-payment waivers.

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

155.    By February 16 to 27, 2023, Relator, with the assistance of her direct report, Billing & Finance Technician Holly O'Donnell, had discovered that, in addition to offering discounts and copay waivers, the records showed that Defendant Truong was also using false "refund" entries to conceal the fact that he had been embezzling company funds.

156.    Defendant SSM Health's senior leadership department and legal department, including Defendant Maywright and SSM Health's Assistant General Counsel Scofield, did not press charges against Defendant Truong.

157.    Further, in an attempt to avoid Government scrutiny, senior leadership, after consultation with its house counsel, Scofield, asked Defendant Maywright not to report Troung's conduct to the Missouri Board of Pharmacy.

158.    When Defendant Maywright reported the embezzlement to Board of Pharmacy despite Defendant SSM Health's direction, Defendants SSM Health, acting through Defendant Maywright and other senior executives including Assistant General Counsel Scofield stymied the investigation by again declining to press charges, which, according to Defendant Maywright's account of her communication with the Board, was a procedural prerequisite for them to open an investigation.

159.    On information and belief, Defendant Maywright's report to the Board of Pharmacy mentioned Defendant Truong's embezzlement but omitted any report of facts underlying the Copay Waiver Scheme.

160.    Relator understood that Defendants were concerned that reporting Troung to the Missouri Board of Pharmacy or to law enforcement would risk triggering an investigation which would uncover the copay waivers and corresponding False Claims Act violations.

161.     Relator's information also led to her understanding that Defendants would not self-report the statutory violations to the government as required by the False Claims Act.

### B. Specific Examples of Copay Waivers & Tainted (False) Claims

162.     The paragraphs below contain representative examples of the false claims submitted or caused to be submitted by Defendants to, and subsequently paid for by, Medicare, Medicaid, and/or other government-funded healthcare programs in violation of the Beneficiary Inducement Statute and AKS.

163.     These examples are based on Defendant SSM Health's electronic health records and billing records, which Relator personally reviewed in the course of her employment with Defendant SSM Health.

### 1. Medicare Beneficiary J.A.

164.     **On May 19, 2021**, Defendant SSM-SLUH, Inc. dispensed sixty (60) 550 mg tablets of Xifaxan, a band-name antibiotic, to **Medicare Beneficiary J.A.** pursuant to a May 19, 2021 prescription.

165.     Defendant SSM-SLUH submitted a corresponding claim for payment for the Xifaxan dispensed to J.A. and received $1,881.68 from Beneficiary J.A.'s Medicare Plan.

166.     As part of this transaction and pursuant to Medicare's conditions of payment, Beneficiary J.A. owed a $1,014.17 copayment.

167.     To induce Beneficiary J.A. to fill the prescription, and the on-going and lucrative future prescriptions at SSM-SLU, Defendant SSM-SLUH collected only a Twenty Dollar ($20.00) payment from J.A. and waived the balance.

168.     SSM-SLUH did not ascertain whether J.A. had a financial hardship prior to waiving the balance of the copayment and did not waive the balance due to any inability to pay.

33

169. SSM-SLUH made no good faith effort to collect the remaining $994.17 copay balance that it had waived.

170. As expected, aware of Defendant SSM-SLUH's willingness to waive nearly all of the high copay required by all other pharmacies and required by the Government plan payment requirements, Beneficiary J.A. returned to Defendant SSM-SLUH's pharmacy to have the same high-dollar prescription refilled on June 11, 2021; July 5, 2021; July 30, 2021; August 30, 2021; October 1, 20211 November 2, 2021; December 28, 2021 and ten (10) occasions between February 1, 2022 and December 1, 2022, each resulting in additional copayment obligations incurred in amounts ranging from $144.79 to $1,155.97 of which Defendant SSM-SLUH, Inc. collected only $20 per refill.

171. With regard to those J.A. prescriptions dispensed after May 2021, SSM-SLUH made no good faith effort to ascertain financial ability to pay or to collect the full copay on any of those prescriptions, but pocketed thousands and thousands of dollars from Government healthcare plans for filling the kick-back induced prescriptions.

### 2. **Medicare Beneficiary C.R.**

172. **On November 1, 2021**, Defendant SSM-SLUH, Inc. dispensed 90mg/ml of Stelara, an injectable immunosuppressant, to **Medicare Beneficiary C.R.** pursuant to a July 29, 2021 prescription.

173. Defendant SSM-SLUH submitted a corresponding claim for payment to the Government for the Stelara dispensed to C.R. and received $23,586.55 from Beneficiary C.R.'s Medicare Plan.

174. As part of this transaction and pursuant to Medicare's conditions of payment, Beneficiary C.R. owed a $1,179.33 copayment.

175. To induce Beneficiary C.R. to fill the prescription and future prescriptions at SSM-SLU, Defendant SSM-SLUH collected only a $50 payment from C.R. and waived the balance.

176. SSM-SLUH did not ascertain whether C.R. had a financial hardship prior to waiving the balance of the copayment and did not waive the balance due to inability to pay.

177. SSM-SLUH made no good faith effort to collect the remaining $1,129.3 copay balance that it had already waived.

178. As expected, aware of Defendant SSM-SLUH's willingness to waive nearly all of the high copay required by all other pharmacies, Beneficiary C.R. returned to Defendant SSM-SLUH's pharmacy and refilled the same high dollar Stelara prescription on December 30, 2021; February 22, 2022; April 14, 2022; and June 6, 2022, resulting in addition copayment obligations of $1,179.33, $3,538.66, $1,243.01, and $550.63 respectively, of which SSM-SLUH, Inc. collected four (4) $50 payments.

179. For those C.R. prescriptions dispensed after November 2021, SSM-SLUH made no good faith effort to ascertain financial ability to pay or to collect the remaining copayment balance of $6,311.63.

### 3. Medicare Beneficiary A.C.

180. **On January 25, 2022**, Defendant SSM-SLUH, Inc. dispensed forty-two (42) 550 mg tablets of Xifaxan, a brand-name antibiotic, to **Medicare Beneficiary A.C.** pursuant to a January 25, 2022 prescription.

181. Defendant SSM-SLUH submitted a corresponding claim for payment and received $1,327.27 from Beneficiary A.C.'s Medicare Plan.

182.     As part of this transaction and pursuant to Medicare's conditions of payment, Beneficiary A.C. owed a $922.42 copayment.

183.     To induce Beneficiary A.C. to fill the prescription, and future prescriptions at SSM-SLUH's pharmacy, Defendant SSM-SLUH, Inc. collected only a $10 payment from A.C. and waived the balance.

184.     SSM-SLUH did not ascertain whether C.R. had a financial hardship prior to waiving the copayment balance and did not waive the balance due to any inability to pay.

185.     SSM-SLUH made no good faith effort to collect the remaining $912.42 copayment balance that it had waived.

186.     As expected, aware of Defendant SSM-SLUH's willingness to waive nearly all of the high copay required by all other pharmacies, Beneficiary A.C. returned to Defendant SSM-SLUH's pharmacy for 290 mcg of Linzess, a constipation medication, filled on June 3, 2022; July 7, 2022; and August 4, 2022 resulting in copayment obligations of $160.71, $132.55, and $132.55, respectively, of which SSM-SLUH, Inc. collected only $20 via two $10 payments.

187.     With regard to those prescriptions dispensed to Beneficiary A.C. after January 2022, SSM-SLUH made no good faith effort to ascertain financial ability to pay or to collect the remaining copayment balance of $405.81.

### 4.    Medicare Beneficiary M.V.

188.     **On July 23, 2021** Defendant SSM-SLUH, Inc. dispensed three hundred and sixty (360) 300 mg capsules of Ursodiol, a generic cholesterol medication, to **Medicare Beneficiary M.V.** pursuant to a July 23, 2021 prescription.

189.     Defendant SSM-SLUH, submitted a corresponding claim for payment, and received $262.09 from Beneficiary M.V.'s Medicare Plan.

36

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

190.    As part of this transaction and pursuant to Medicare's regulations and conditions of payment, Beneficiary M.V. owed a $141 copayment.

191.    To induce Beneficiary M.V. to fill the prescription and future prescriptions, at Defendant SSM-SLUH's pharmacy, Defendant SSM-SLUH, Inc. collected only a $30 payment from M.V. and waived the balance.

192.    SSM-SLUH did not ascertain whether M. V. had a financial hardship prior to waiving the copayment balance.

193.    SSM-SLUH made no good faith effort to collect the remaining $111 copay balance from Medicare Beneficiary M.V.

194.    Subsequently, Beneficiary M.V. returned to SSM-SLUH's pharmacy and obtained filled Ursodiol prescriptions on November 18, 2021; February 16, 2022; May 18, 2022; June 29, 2022; September 28, 2022; and December 27, 2022, incurring a total of $752 in additional copayment obligations of which Defendant SSM-SLUH Inc. charged and collected only $160 total, waiving the balance.

195.    For those prescriptions dispensed to Beneficiary M.V. after July 2021, SSM-SLUH made no good faith effort to ascertain financial ability to pay or to collect the remaining copayment balance of $592.

### 5.    Medicare Beneficiary O.W.

196.    **On September 26, 2022,** Defendant SSM-SLUH, Inc. dispensed sixty (60) 550 mg tablets of Xifaxan, a brand-name antibiotic, to **Medicare Beneficiary O.W.** pursuant to a September 26, 2022 prescription, submitted a corresponding claim for payment, and received $2,139.45 from Beneficiary O.W.'s Medicare Plan.

197.    As part of this transaction and pursuant to Medicare's conditions of payment, Beneficiary O.W. owed a $1,074.74 copayment.

198.    To induce Beneficiary O.W. to fill the high dollar prescription and future prescriptions at its pharmacy, Defendant SSM-SLUH, Inc. waived Beneficiary O.W.'s *entire* $1,074.74 copayment.

199.    SSM-SLUH did not ascertain whether O.W. had a financial hardship prior to waiving the entire copayment balance for Medicare Beneficiary O.W.

200.    SSM-SLUH made no good faith effort to collect any of the $803.41 copayment obligation from Medicare Beneficiary O.W.

201.    Subsequently, Beneficiary O.W. returned to Defendant SSM-SLUH to have the same high dollar prescription filled on October 24, 2022; November 18, 2022; December 30, 2022; and January 24, 2023 resulting in copayment obligations of $803.41, $803.42, $176.41, and $1,117.76, respectively, all of which Defendant SSM-SLUH waived in their entirety.

202.    For those prescriptions dispensed to Medicare Beneficiary O.W. after September 2022, SSM-SLUH made no good faith effort to ascertain O.W.'s financial ability to pay or to collect any of the copayment which totaled $3,704.41.

203.    The five (5) detailed Medicare Beneficiary examples above are just a small, illustrative sample of the hundreds of thousands of dollars of Medicare copayment obligations waived by Defendant SSM-SLUH, Inc. since it opened in 2020 which were intended to and did induce millions of dollars of false claims submitted to and paid for by Government healthcare plans.

204.    On information and belief, due to its location within the St. Louis University Medical Center, which houses a relatively prolific transplant program specializing in treating

38

**Filed Under Seal Pursuant
to 31 U.S.C. § 3730(b)(2)**

liver and kidney transplant patients, Defendant SSM-SLUH Inc.'s **Copay Wavier Scheme** was intended in part to induce transplant patients to have their high dollar transplant medications filled at Defendant SSM-SLUH, Inc., which was very lucrative for Defendant SSM-SLUH.

## C. Defendants' Low Risk Cover-up Scheme and Failure to Return Fraudulently Obtained Payments

205.   To the extent they had not been before, by late February 2023, Defendants were fully aware of the nature and extent of the false claims caused by the **Copay Waiver Scheme** carried out by Defendant SSM-SLUH's Pharmacy Manager and Pharmacist in Charge, Defendant Johnny Truong.

206.   On or about March 15, 2023, Defendant Maywright met with Defendant SSM Health's legal department, including Defendant SSM Health's Assistant General Counsel Christipher Scofield, to discuss how to address the inducement scheme and the hundreds of thousands of dollars of uncollected copay balances and the millions of dollars of copayment waiver induced prescriptions and related payments to Defendant SSM Health.

207.   Following that meeting and after obtaining legal advice from their Assistant General Counsel, Defendant Maywright informed Relator that Defendant SSM Health had decided that it would neither self-disclose the scheme to the government nor initiate good-faith collection efforts by mailing statements to the affected Patient-Beneficiaries.

208.   Defendant SSM Health's management decided that retaining profits was more important than adhering to their FCA repayment obligations, despite their being fully aware of their legal obligations to self-report and repay the fraudulently obtain funds.

209.   When Relator pointed out how a local pharmacy in her hometown of Oshkosh, Wisconsin had once been subject to a sweeping audit and large fine for similar conduct, i.e. cash

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

pricing and copay waivers, **Defendant Maywright said that Defendant SSM Health had determined that the risk of the violations being discovered was low, and that even if they were caught, the risk of their contracts being canceled was also very low.**

210.    Defendant Maywright also told Relator that Defendant SSM Health was confident that in the unlikely event of any on-site audit of Defendant SSM-SLUH, Inc., outside counsel would be there to help Defendants "**make up an excuse.**"

211.    In a March 15, 2023 email exchange between Relator and Holly O'Donnel, one of her direct reports who had assisted in uncovering the Copay Waiver Scheme, Relator addressed a conversation she had just had with Defendant Maywright regarding the Copay Waiver Scheme.

212.    In the email, Relator refers to what Defendant Maywright had told Relator prior to a meeting Defendant Maywright was going to have with Defendant SSM's Legal Department, about Defendant SSM's anticipated response to the Copay Wavier Scheme.

213.    In response, Ms. O'Donnell expressed surprise and concern, to which Relator replied "*Yeah….I'm not at all in agreement with what legal is stating we should be doing.*"

214.     Indeed, by early April 2023, Defendant SSM Health, acting through senior executives including Defendant Maywright, had implemented a strategy to cover up the unlawful copay waivers by ordering the outstanding copay balances to be "written off" gradually at a slow rate of only about $20,000 per month in order to avoid detection of the write-offs in the "unlikely" event of a future Government audit.

215.    For example, in an April 5, 2023 email to Defendant Maywright's direct report Brent McClain with the subject line "**Confirm to be written off**" and referring to uncollected Patient-Beneficiary balances from over a year ago, O'Donnell confirmed that a "*Total of -22653.54*" was "*to be written off in April for the March copays billed.*"

40

**Filed Under Seal Pursuant
to 31 U.S.C. § 3730(b)(2)**

216.    In addition, by April 2023, Defendants SSM Health, SSM-SLUH Inc, and Maywright had directed staff, including Madalyn McCarthy and her "Pharmacy Access" team, to begin performing *post-facto* assessments of whether certain Patient Beneficiaries with large, uncollected copay balances may have been eligible for various charity funding due to financial need, underscoring the fact that no such assessment was performed at the time of the original waivers and that Defendants were indeed pursuing a cover-up to avoid detection of the copay waivers by the Government, as senior management had explained to Relator.

217.    On April 20, 2023, increasingly concerned that Defendants' response to the discovery of the **Copay Waiver Scheme** was focused on damage control and concealment rather than prevention or repayment, Relator emailed Defendant Maywright the following:

> **With the increase of on-site audits happening with the PBM's, have we been given any guidance from legal and CRP on self-reporting our situation at SLU? With amount of specialty drugs they dispense, I'm worried an on-site audit will be scheduled and we will not have done our due diligence in notifying an having a P & P in place related [to] collecting copays, making price tables, etc.**

218.    Indeed, while Defendants SSM Health and SSM-SLUH had generic, general anti-fraud policies referencing the prohibition of copay waivers and describing the appropriate charity eligibility determination process in broad strokes, there was no specific policy or procedure in place training or informing clients how to respond once a copay waiver has been identified.

219.    Similarly, Defendant SSM Health's "Collection of Prescription Copays" policy, effective since November 10, 2020, failed to provide clear direction regarding copay collection efforts and other Medicare requirements.

220.    For example, after a patient "verbalizes that they are unable to pay their copay," Defendant SSM Health's policy merely "encourages" employees to "explore applicable

41

prescription cost assistance tools outlined in" SSM Health's "Prescription Cost Assistance Tools & Pharmacy Access to Care" policy ("Charity Policy").

221.    Likewise, Defendant SSM Health Charity policy lacks checks and balances, such as clear documentation requirements for economic need assessments, recognition of the differences between various PBM contracts, or a required review or periodic audit of how the policy is being implemented.

222.    However, these vague policies were only indicative of an interest in having compliance on paper, but not on actually implementing any copayment policy at all.

223.    In reply to Relator's April 20, 2023 email the same day, Defendant Maywright, copying SSM Health's Vice President of Community Pharmacy, Kristin Cannon, acknowledged SSM Health's deficient policies and procedures, and offered vague and non-specific next step:

> ***Copying Kristin so she can help speak to it; there have been delays in valuable updates within that group due to waiting on external council [sic]. We meet again Tuesday and I will escalate this again***.

224.    By early-to-mid May 2023, Defendants had still taken no steps toward (a) sending statements to Patient Beneficiaries or otherwise attempting to collect any of the outstanding copayments; (b) self-disclosing the violations to any state or federal regulatory body; (c) repaying the fraudulently obtain government payments; or (d) implementing any new policies, procedures, or training.

225.    Instead, Defendants continued to assess whether any of the SSM-SLUH copay waivers could be **retroactively justified** under various charities or financial assistance programs.

42

226.   Defendant Maywright was directly involved in this effort, as illustrated in the May 3, 2023 email in which she asks Billing and Finance Technician Holly O'Donnell to provide certain data from the Accounts Receivable (A/R) accounts.

227.   In reply, referring to what was then the ongoing scheme to systematically write off the outstanding balances, Holly O'Donnell provides the data and states:

> "*Here are all of the charity, 340B, and specialized billing for [SSM-SLUH Inc] April 2023. Are they supposed to be using the SLUH Account any more? That is just being written off each month*"

228.   As of June 9, 2023, Defendants still had not disclosed the Copay Waiver Scheme to any state or federal agencies or Medicare sponsors; returned any funds to the Government; or implemented any new or improved policies or procedures to prevent similar schemes or provided any training to staff to comply with the copayment requirements of Government healthcare plans.

## VIII.   <u>COUNTS</u>

### <u>COUNT ONE</u>

### <u>False Claims Act, 31 U.S.C. § 3729(a)(1)(A)</u>

### (against all Defendants)
### Defendants' Copay Waiver Scheme

272.   Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

273.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

43

274.    31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

275.    By engaging in the conduct set forth herein relating to billing for medication dispensed to patients who received remuneration in violation of the Anti-kickback Statute and/or Beneficiary Inducement Statute, Defendants have knowingly presented or caused to be presented false or fraudulent claims for approval in violation of 31 U.S.C. § 3729(a)(1)(A).

276.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid were the Government aware of Defendants' scheme.

277.    By reason of Defendants' acts and omissions, the United States has suffered substantial actual damages.

## COUNT TWO

### False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

**(against Defendants SSM Health, SSM-SLUH, and Maywright)
Reverse False Claim / Failure to Return Overpayments)**

278.    Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

279.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

280.    31 U.S.C. § 3729(a)(1)(G) imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or

transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

281.    Defendants SSM Health, SSM SLUH, Inc. and Maywright, knew, beginning before February 16, 2023, that Defendants had submitted or caused the submission of claims rendered false by violation of the AKS and Beneficiary Inducement Statute and received overpayments from Medicare as result of such submissions.

282.    To date, Defendants have failed to return, or cause to be returned, the identified Government-funded overpayments that resulted from these false claims.

283.    Through the acts described above, Defendants knowingly concealed money that was owed to the Government when Defendants failed to return to the Government payment received for medications which Defendants knew were not eligible for reimbursement under Medicare program or were overpayments.

284.    By reason of Defendants' acts the United States has suffered actual damages.

## COUNT THREE

### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

**(Against Defendants SSM Health, SSM-SLUH Inc. and SSM Slu-Care)
Violation of the Stark Law**

285.    Relator realleges alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

286.    On information and belief, Defendant SSM Health Care Group, Inc. d/b/a SLU-Care Physician Group (SLU-Care), at all times relevant to this complaint, had a financial

45

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

relationship with Defendant SSM-SLUH Inc.'s pharmacy by virtue of its operational and in financial relationship with SSM-SLUH Inc.'s parent company, SSM Health.

287.    Defendant SSM Health Care Group, Inc. d/b/a SLU-Care Physician Group (SLU-Care) violated 42 U.S.C. § 1395nn by making referrals of Beneficiaries for designated health services, i.e. prescription medication and pharmacy services, to Defendant SSM Health and SLUH-Inc, despite the financial relationship that Defendant SLU-Care has with Defendant SSM-SLUH, Inc. and its parent company, Defendant SSM Health.

288.    Under Stark, a "financial relationship" consists of a "compensation arrangement." A "compensation arrangement" is any arrangement involving any remuneration between a physician and an entity, subject to certain exclusions. 42 U.S.C. § 1395nn(h)(1)(A).

289.    "Remuneration" includes any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind, subject to certain exclusions. 42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. § 411.351.

290.    No exclusions apply in this case.

291.    On information and belief, both Defendants Slu-Care and SSM-SLUH, Inc. are part of Defendant SSM Health's network and, as such, receive and provide, directly or indirectly, compensation and revenue from and to Defendant SSM Health.

292.    Additionally, Defendant SSSM-SLUH, Inc., during the pendency of the Copay Waiver Scheme from 2021 to 2023, provided remuneration to Defendant SLU-Care by providing copay waivers to Defendant SLU-Care's patients, which induced them to return for additional services not only from Defendant SSM-SLUH's pharmacy but also Defendant SLU-Care's physicians.

46

**Filed Under Seal Pursuant
to 31 U.S.C. § 3730(b)(2)**

293.    Defendants SSM-SLUH, Inc. and SLU-Care, through the practices described above, have intentionally violated Stark, 42 U.S.C. § 1395nn and caused the submission of claims to Medicare for outpatient prescription drug services resulting from prohibited self-referrals.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Relator and the United States are entitled to damages from Defendants in accordance with the provisions of 31 U.S.C. §§ 3729-3733. Relator requests that judgment be entered against Defendants, including that:

a.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.;*

b.    Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $11,803 and not more than $23,601 for each violation of 31 U.S.C. § 3729 committed after November 2, 2015 pursuant to § 3729 (a)(1) and 28 C.F.R. § 85.5 or as may be further adjusted;

c.    Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d);

d.    Relator be awarded the maximum amount allowed as a Relator share pursuant to 31 U.S.C. § 3730(d);

e.    The United States and Relator be granted all such other relief as the Court deems just and proper.

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

**PLEASE TAKE NOTICE THAT THE PLAINTIFF/RELATOR DEMANDS THE ABOVE-ENTITLED ACTION TO BE TRIED TO A 12-PERSON JURY.**

Respectfully submitted and dated this 30th day of October 2023.

**Attorneys for Relator Emily Hunter**

By:    /s/ Nola J. Hitchcock Cross
Nola J. Hitchcock Cross
**Cross Law Firm, S.C.**
Lawyer's Building, 845 North 11th Street
Milwaukee. WI 53233
Phone: (414) 224-0000
Fax: (414) 273-7055
Email: njhcross@crosslawfirm.com